KANSAS CITY, MEMPHIS & BIRMINGHAM RAILROAD COMPANY *v.*
JASON W. HEARD.

[39 South. Rep., 1011.]

RAILROADS. *Injury to live stock. Exceptions in contract. Burden of proof.*

Where, in a suit against a railroad company for damage to live stock suffered during carriage by the company, the defense is that the injury arose from an excepted cause in the bill of lading, the burden of proof is on the defendant to establish the defense.

FROM the circuit court of Monroe county.

HON. EUGENE O. SYKES, Judge.

Heard, the appellee, was the plaintiff in the court below; the railroad company, the appellant, was defendant there. From a judgment in plaintiff's favor the defendant appealed to the supreme court. The facts are stated in the opinion of the court.

*J. W. Buchanan,* for appellant.

It is in evidence, and undisputed, that the stock was loaded by appellee himself; it is in evidence, and not denied, that the stock was all standing up in the cars at Amory and on arrival at

Tupelo; it is in evidence, and not denied, that the stock was carried to the point of destination of appellant within a reasonable time and without delay. Appellant proves by the conductor, flagman, and engineer that there was no rough handling of these cars between the points above mentioned.

It is in evidence, and not denied, that these cars were put in the rear of the train, so that they would not be disturbed in switching; that these cars were not switched during the journey; and that appellant in only two places cut off the front of the train from the rear and put out some cars, without in the least disturbing the cattle except what might necessarily result from making the coupling. It is in evidence, and not denied, that this stock was in poor condition for shipment. Appellant's and appellee's witnesses both testified to this.

We submit that whether there were ninety-five or one hundred and twenty cows in each of the thirty-six-foot cars, common sense teaches there was a serious question whether or not they were overcrowded. Appellee's own witnesses say the cars were to some extent overcrowded, while these witnesses had seen as many cattle shipped prior thereto.

Now, does not the condition of the stock, as shown by appellee's testimony and the affirmative proof of appellant's witnesses, and not denied, make out at least a *prima facie* case that required appellee to overcome by testimony, showing some negligent act between the point of shipment and that of destination?

Again, beside the fact that the testimony shows that there were twenty-five more cows called for in the bill of lading than were put in the cars, we again call the court's attention to the testimony on this point, although we submit that appellee is estopped under this contract if the cattle escaped out of the doors that they attempted to prove existed in the cars. It is in proof, and not denied, that the cars were sealed with a C. P. seal, the only seal of that character on the line; and it is in evidence, and not denied, that this same seal was unbroken when the cars

arrived at Amory, Miss. It is in proof by both conductors that this seal was intact when the cars were delivered at Amory and intact when the conductor started with the cars from Amory to Tupelo. It is in proof that when these cars were delivered to the Mobile & Ohio Railroad the seal was intact, and the Mobile & Ohio employes themselves broke the seal and made the count, and appellee's own witnesses only make out, dead and alive, in both cars, ninety-five head of cattle.

There was no possible way for these cows, as shown by the testimony, to have gotten out of the car, except to jump through a window that is in the top of each end of the cars, or by breaking open the doors, when the seals would have to be broken. Appellee finished loading at the time of night when it was impossible to count the cattle, and the contract shows that the agent signed the contract, which says the number "is supposed to be one hundred and twenty cows." This indicates that he did not count or rely on his own information as to the number of cattle in these cars. Is it reasonable to suppose that these twenty-five head of cattle could have gotten out of those cars with the seals of the same unbroken? Under these facts the court below should have decided that there was not sufficient testimony to sustain the verdict of the jury, either for the cattle that were killed or for those claimed to have been in the cars.

*Gilleylen & Leftwich,* for appellee.

It will be seen that appellee Heard did not sue on the contract or bill of lading—which, of course, he was compelled to sign in order to get his cattle shipped, as every other shipper of cattle is, whether he likes the terms of it or not—but he sues in tort for the wrong and injury done his cattle by appellant road in transit, just as was done by appellant in the case of *Waters* v. *Mobile & Ohio R. R. Co.,* 74 Miss., 534 (s.c., 21 South. Rep., 240). The bill of lading is now in evidence in this case; but it was introduced by the railroad, and not by the appellee. It is shown that

appellee also made claim against the Mobile & Ohio Railroad. Of course, when his cattle were injured, he could not afford to do otherwise than make claim against both roads until he could investigate and find out which railroad did the mischief.

We reply to all of the portions of the contract adduced by appellant's counsel by saying that the railroad cannot contract against its own negligence. Carriers are insurers of goods. *Express Co.* v. *Seide,* 67 Miss., 609 (s.c., 7 South. Rep., 547); *Railroad Co.* v. *Bogard,* 78 Miss., 11 (s.c., 27 South. Rep., 879).

It is manifest by even a casual reading of the record that the railroad not only did not make out even a *prima facie* defense, but wholly failed to show due care in the transportation of these cattle.

Suppose in this case we had sued the last carriers—the New Orleans & Northeastern Railroad Company and the Mobile & Ohio Railroad Company. They would have at once exculpated themselves by showing that the injury was done before the cattle reached their roads, and that they refused to receive them until an exception was signed by the agent of appellant at Tupelo. *Faison* v. *Railroad Co.,* 69 Miss., 569 (s.c., 13 South. Rep., 37); *Railroad Co.* v. *Tupelo Furniture Co.,* 67 Miss., 35 (s.c., 7 South. Rep., 279).

True it is that the initial carrier is not liable for damages done by the connecting carrier unless the initial carrier undertakes to carry the cattle through. *I. C. R. R. Co.* v. *Kerr,* 68 Miss., 14 (s.c., 8 South. Rep., 330); *Crawford* v. *Railroad Co.,* 51 Miss., 222.

But the converse of this proposition is also true—that the initial carrier is liable for all damage done by it, and this damage can be shown by the condition of the cattle when they reached their destination or when they reached the connecting carrier; so any other evidence tending to show that it committed the wrong. If it undertakes to exculpate itself by a special contract or special clause in the contract and show that the damage was

done without its fault, then the burden is on it to show it. *John-son* v. *Railroad Co.*, 69 Miss., 191 (s.c., 11 South. Rep., 104).

Argued orally by *J. W. Buchanan*, for appellant.

HARPER, Special J., delivered the opinion of the court.[*]

This is an action of tort, brought by J. W. Heard against the Kansas City, Memphis & Birmingham Railroad Company for its failure to deliver safely certain cattle intrusted to it for shipment from Sulligent, Ala., to New Orleans, La. There was judgment in the lower court for the plaintiff, and the defendant appealed.

The proof for the plaintiff tended to show that he delivered to defendant one hundred and twenty head of cattle, consisting of calves, yearlings, and cows, for shipment; that when the cars were delivered to the Mobile & Ohio Railroad Company at Tupelo there were twenty-five missing, five dead, and many of the remainder seriously bruised, scarred, and otherwise injured. The defendant undertook to show by its employes that it had exercised due care; that it delivered to the connecting line all the cattle intrusted to it, and that they were in good condition when so delivered. The defendant also offered in evidence a bill of lading, containing provisions as follows: "(1) The shipper hereby agrees that he will select the car or cars to be used for transportation of such stock, and before making such selection he will carefully examine and inspect the same, and each one of them, and will only select such cars as are in good and suitable condition, and after such stock is loaded and before the same leaves the first station above named he will again examine said car or cars, and will see that all the doors and openings in said cars are closed, and so fastened, and afterwards kept so closed and fastened, as to prevent the escape of said stock therefrom, and that he will at once notify the company of any defect in the floors, doors, fasten-

---

[*]Chief Justice Whitfield, because of illness, did not preside in this case. William R. Harper, Esq., a member of the supreme court bar, was appointed and presided as special judge in place of the chief justice.

ings, or slats on said cars, and the manner in which such doors or slats are placed upon or attached thereto, and in case of finding any such defect will demand in writing another car or cars in lieu of such car or cars so found defective. . . . (3) For the consideration aforesaid, it is further agreed that neither the company nor any connecting carrier shall be responsible for any damage or injury sustained by said live stock, by reason of any defect in the cars used in the transportation thereof, in consequence of the escape of the said live cattle through the doors and openings in said cars, or by reason of the stock being wild, unruly, weak, maiming each other or themselves, or from fright of animals, or from crowding of one upon another, or from heat or suffocation, whether caused by overloading of said cars or otherwise." The defendant also offered evidence that tended to show that the cattle were poor and in bad condition when shipped, and that too many had been crowded into the cars. Whereupon the plaintiff offered proof which tended to show that he had performed everything required of him in the foregoing provisions of his contract, that the cattle were in fair condition for shipment, and that the cars were not overcrowded.

The defendant asked and obtained an instruction as follows: "(3) The court charges the jury that, if they believe from the evidence that the injury to plaintiff's stock was the result of their poor condition and overcrowded cars, then there can be no liability on the defendant, and the jury will find for the defendant." The main effort of defendant in the court below seemed to be to show by its employes that all the cattle it had received had been delivered to the connecting carriers and that they were in good condition when so delivered. There was no effort to show how the loss and injury of the cattle occurred, for that was denied. There was some proof that the cattle were in poor condition for shipment, and that if there were one hundred and twenty head of cattle in the two cars, as claimed by plaintiff, such would have been an overloading. But plaintiff's evidence contradicted this,

and was properly submitted to the jury, who found for plaintiff. In the very case cited by appellant—*Chicago R. R. Co.* v. *Abels,* 60 Miss., 1023—this court said: "The carrier must show full performance of duty with respect to what was shipped according to its nature, and when that showing is made, and that the injury was from an excepted cause in the contract, liability cannot be fixed on the carrier, except by proof of a want of due care and diligence."    In the instant case the defendant failed to show "that the injury was from an excepted cause in the contract" to the satisfaction of the jury, and hence the defendant failed to overcome the *prima facie* case made out by the plaintiff.    The other errors complained of by appellant seem to be without merit.

*The judgment of the lower court is therefore affirmed.*